**In re HILLSBOROUGH HOLDINGS CORPORATION, et al., Debtors.**

**The CELOTEX CORPORATION, et al., Appellants,**

v.

**HILLSBOROUGH HOLDINGS CORPORATION, et al., Appellees.**

No. 94–889–CIV–T–21C.
Bankruptcy Nos. 89–9715–8P1 to 89–9746–8P1 and 90–11997–8P1.
Adv. Nos. 90–0003, 90–0004.

United States District Court,
M.D. Florida,
Tampa Division.

Oct. 13, 1994.

Marsha G. Rydberg, Rydberg, Goldstein & Bolves, P.A., Tampa, FL, Trevor W. Swett, Caplin & Drysdale, Washington, DC, for appellants.

Charles E. Koob, Simpson, Thacher & Bartlett, New York City, Don Mason Stichter, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for Hillsborough Holdings Corp.

Jeffrey W. Warren, Bush, Ross, Gardner, Warren & Rudy, P.A., Tampa, FL, for Celotex Corp.

Michael Byrley Colgan, Hoyt, Colgan & Andreu, P.A., Tampa, FL, for Jim Walter Corp.

Charles E. Koob, Simpson, Thacher & Bartlett, New York City, Don Mason Stichter, Stichter, Riedel, Blain & Prosser, P.A., Tampa, FL, for Walter Industries.

## OPINION AND ORDER

NIMMONS, District Judge.

This is an appeal by the Celotex Corporation, various Asbestos Claimants, and the Jim Walter Corporation, from a final judgment entered by Judge Alexander L. Paskay of the United States Bankruptcy Court, Middle District of Florida, in an adversary pro-

ceeding arising from the non-consolidated Chapter 11 reorganizations of Hillsborough Holdings Corporation, now called Walter Industries, Inc., and its 31 wholly-owned subsidiaries. *In re Hillsborough Holdings Corp.*, 166 B.R. 461 (Bankr.M.D.Fla.1994). Appellants, Defendants in the adversary action below, include a group known as the asbestos claimants, individuals who have suffered personal injury and property damage from asbestos products. Appellants also include Celotex Corporation ("Celotex") and Jim Walter Corporation, the sole shareholder of Celotex. Appellees, Plaintiffs and Debtors in the adversary case below, are Hillsborough Holdings Corporation ("HHC"), now known as Walter Industries, Inc. ("Walter Industries"), and its 31 wholly-owned subsidiaries.

Prior to 1987, the old Jim Walter Corporation ("JWC") acted as a holding company, owning all the stock in various subsidiaries, including Celotex. In 1987, JWC was the subject of a multi-step leveraged buy-out (the "LBO"), in which JWC was acquired by and merged into a newly formed corporation called Hillsborough Acquisition Corporation ("HAC"). HAC then transferred all of JWC's assets, except Celotex, to two newly-created holding companies, HHC and Walter Industries. HAC next changed its name to Jim Walter Corporation. HHC sold this "new" Jim Walter Corporation, along with its subsidiary Celotex, to a third party, the Jasper Corporation. Although this "new" Jim Walter Corporation is an Appellant in this case, this Court's discussions of the issues on appeal primarily concern conduct of the "old" JWC, as it existed prior to the LBO.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

JWC was incorporated in 1955 to engage in the home construction business. JWC acquired the Celotex Corporation in 1964. At that time, Celotex was a large manufacturer of home building materials. Throughout the years, Celotex acquired various divisions and subsidiaries. JWC also acquired various other businesses, and in 1970, JWC became a holding company to manage its diverse business activities. In 1972, Celotex obtained a controlling interest in The Panacon Corporation ("Panacon"), a distributor of asbestos products, utilizing a $62 million advance from JWC to obtain this interest. Soon thereafter, Panacon merged with Celotex. Following the merger, Celotex was named as a defendant in numerous lawsuits instituted against Panacon prior to the merger.

Between 1972 and 1987, as asbestos litigation increased generally, Celotex became a defendant in an increasing number of actions. From 1973 to 1981, the number of plaintiffs commencing suit against Celotex doubled each year. In 1982, lawsuits against Celotex numbered 15,100; in 1983 lawsuits increased to 20,100; in 1984 that number increased to 25,600; and in 1985, the number of lawsuits reached 34,900. During this time, JWC and Celotex management knew of the number of lawsuits pending against Celotex, knew of the costs of settlements made in various lawsuits, and were informed of the prospects of then-pending litigation.

The adversary action raised numerous issues concerning the intercorporate relationship between Celotex and JWC. It is undisputed that the members of JWC's board of directors also sat on the boards of JWC's subsidiaries, including Celotex. Celotex's board of directors met face-to-face on only a few occasions. Instead, they took actions, including action concerning the disposition of various assets, by written consent of the board members. Celotex had full control over the hiring and firing of employees and management of its payroll. Celotex kept individual accounting records and maintained independent corporate minute books. Celotex had both "core" and "non-core" businesses. Each of the core businesses was included in one of three divisions: Building Products, Industrial Products, or Roofing Products.

JWC, as part of its management structure, had five group vice presidents, responsible for specific areas of JWC's business. JWC's various subsidiaries, including Celotex, reported not only to subsidiary management, but to the group vice president in charge of

the subsidiaries' respective line of business. Additionally, the heads of Celotex's "non-core" subsidiaries reported directly to that group vice president in charge of its area of business. JWC's management actively participated in its subsidiaries' long-term business planning, including the acquisition, transfer and disposition of various assets. However, JWC played no part in the day-to-day operations of its subsidiaries.

In the 1970s, JWC established a cash management system for all of its wholly-owned subsidiaries. Under such system, cash generated by the subsidiaries was transferred to a centralized cash management account maintained by JWC. Customers of JWC's various subsidiaries made payments directly to those subsidiaries. The subsidiaries would place those checks in a bank account maintained by the subsidiary, referred to as a depository transfer account, or "lock box." That same day, or the following day, funds deposited in that account were transferred to a concentration account maintained by JWC. Celotex maintained records of all funds placed in the lock box, and was credited for those funds. JWC's cash management system was comprised primarily of two accounts for each of its subsidiaries, the 501 account and 502 account. Within the cash management system, each subsidiary maintained a "zero balance disbursement account," from which Celotex paid its trade creditors and operating expenses. At the end of each day, the bank would advise JWC of the amount of checks presented to the subsidiary's zero balance account for payment, and JWC would transfer funds from the concentration bank account to cover the checks written. JWC maintained daily cash sheets, and an accounting of funds disbursed by each subsidiary. The 501 account included postings of all deposits and disbursements going through the cash management system. The 502 account reflected those funds received directly by JWC on behalf of a subsidiary. JWC would notify its subsidiary of any transfer directly to the 502 account, on its behalf, through an advice on interdivision charge or credit, and each subsidiary got credit for these funds. The 502 account also reflected a receivable. Each of JWC's subsidiaries had its own accounting department, and each subsidiary received monthly statements for the 501 and 502 accounts.

The 502 account also reflected loans made by JWC to its subsidiaries. JWC obtained funds from outside lenders and made those funds available to subsidiaries. The practice of obtaining large loans for use by all subsidiaries proved economically beneficial to the subsidiaries, as they could obtain funds at a significantly lower rate of interest and without various restrictions accompanying the loans. The intercorporate advances were never formalized with loan documents or promissory notes. The advances were recorded in the 502 account as "intercompany payables," and were represented as such in various financial reports. When excess funds remained in the JWC's concentration account, JWC utilized those funds to make payments on loans obtained by JWC from outside lenders.

JWC provided various services to its subsidiaries, including legal services, human resources services, accounting and tax service, and investment advisement services. JWC charged each subsidiary for these services through an intercorporate assessment. The assessment also reflected the costs incurred by JWC in obtaining loans and making those funds available to subsidiaries. Each subsidiary's assessment was based upon a portion of the projections of net assets employed by the subsidiary. When the assessment exceeded or was less than the estimate charged, the subsidiary was credited or debited the appropriate amount. The assessment due from the subsidiary to JWC was also included as part of the "intercompany payable" on JWC's financial statements.

From 1981 to 1987, Celotex disposed of various subsidiaries and divisions in conjunction with a cost-cutting plan implemented by JWC and its subsidiaries. The cost-cutting plan was initiated in response to the recession of the early 1980s. The recession, causing high interest rates and inflation, proved significantly detrimental to JWC's businesses. The demand for new housing fell, thus decreasing JWC's sales of home building products. The increasing interest rates further affected the various loans obtained

by JWC from outside lenders, as these loans had adjustable interest or floating interest rates.

As part of the cost-cutting plan, JWC held various meetings with heads of its subsidiaries and divisions, and requested these divisions to examine their businesses and to recommend the disposition of any such businesses which proved unprofitable or only marginally profitable. The heads of various subsidiaries, including the president of Celotex and various heads of Celotex's subsidiaries and divisions, evaluated their businesses and made recommendations to JWC for disposition of assets. As a result of this procedure, JWC and its subsidiaries targeted several subsidiaries for sale.

Between 1981 to 1987, Celotex sold seventeen companies, including fifteen sales to third parties and two intercorporate sales. Both the boards of JWC and Celotex were involved in the sale of these assets, which generated proceeds of $151.6 million. The companies sold included those with historically poor performance and those cyclical in nature, which had exhibited poor performance during the recession. JWC utilized the proceeds generated from the sale of various Celotex assets to reduce the intercompany payable. By 1987, the outstanding payable was satisfied in full.

## B. Pretrial Proceedings in the Bankruptcy Court

Appellees filed Chapter 11 petitions in December of 1989, and commenced these adversary proceedings in January of 1990. In their four-count Amended Adversary Complaint, Appellees requested that the Bankruptcy Court make four final declarations including:

1. That the corporate veil between JWC and Celotex may not be pierced,

2. That the LBO of Jim Walter Corporation was not a fraudulent conveyance, nor were any subsequent transactions entered into as a part of that LBO fraudulent transfers,

3. That neither HHC, [now known as] Walter Industries nor any of their subsidiaries or affiliates is the successor in interest to the asbestos-related liabilities of either Jim Walter Corporation or Celotex,

4. That neither HHC [now known as] Walter Industries nor any of their subsidiaries or affiliates is liable for the asbestos-related liabilities of either JWC or Celotex.

Appellees sought declarations on the above four matters to finally determine the liability of Walter Industries and its subsidiaries to asbestos claimants for asbestos-related injuries. The reasoning underlying Appellees' desire to obtain the four-part declaration was as follows. If Appellants successfully pierced the corporate veil between JWC and Celotex, they would be able to hold JWC liable for asbestos claims asserted against Celotex. JWC's liabilities would have rendered JWC insolvent at the time of the LBO. Thus, Appellants could attack and set aside the LBO as a fraudulent transfer.

During the course of pretrial proceedings, the Bankruptcy Court entered various orders which served to narrow the issues for the trial. One such order was entered on a Motion for Partial Summary Judgment, filed by Appellees, in which Appellees sought summary judgment on Count I of the Amended Adversary Complaint concerning the veil-piercing issue. The Bankruptcy Court permitted the parties to engage in discovery prior to considering Appellees' motion. Following a hearing and consideration of the parties' briefs, the Bankruptcy Court entered an order denying the motion. Because Appellees' motion concerned only the veil-piercing issue, the Bankruptcy Court's Order exclusively addressed this issue, and did not consider other counts of the Adversary Complaint.

In its Order, the Bankruptcy Court found several facts to be without dispute, but was unable to enter summary judgment in favor of Appellees as a matter of law due to conflicting factual inferences concerning the corporate veil issue. The Bankruptcy Court indicated that the accounting activities of JWC and its subsidiaries and JWC's use of the cash management system raised questions concerning the separateness of JWC and its subsidiaries. The Bankruptcy Court further noted that issues of fact remained concerning the extent of the control exer-

cised by JWC over the affairs of Celotex, in particular with respect to the divestiture of Celotex's assets and upstreaming of sale proceeds to JWC. The Court noted that it would be required to examine the purpose behind the sale of the assets and to characterize the upstreaming of sale proceeds as either repayment of a loan or return of equity to JWC.

Following the Bankruptcy Court's entry of the summary judgment order, Appellees filed a motion to reopen the record in order to present additional evidence pursuant to Rule 43(e), Federal Rules of Civil Procedure, as adopted by Rule 9017, Federal Rules of Bankruptcy Procedure. In the motion, Appellees requested that the Court find the facts recited in its summary judgment order to be without dispute and that the court reopen the record to take additional evidence and make findings necessary to amend the summary judgment order in Appellees' favor. The Bankruptcy Court heard argument on the Rule 43 motion and denied it in October of 1992. In its order denying the motion, the Court noted that the facts set forth on pages five through thirteen of its order were without dispute. The Court further indicted that other facts might be relevant to the veil-piercing issue. Specifically, Appellees could present facts tending to show whether Celotex disposed of its assets for valid economic reasons, whether the upstreaming of sale proceeds to JWC was a repayment of a valid obligation, and whether the upstreaming of assets rendered Celotex insolvent and unable to respond to the claims of various asbestos claimants.

The Bankruptcy Court then held a pretrial conference to prepare the case for the final evidentiary hearing. At the conference, the parties revealed that they had differing opinions regarding the effect which the Bankruptcy Court's summary judgment and Rule 43(e) orders would have on the issues to be tried. Appellees argued that the Bankruptcy Court intended to limit the issues and evidence presented to those matters delineated in the summary judgment and Rule 43(e) orders. In response, Appellants indicated that they had limited their presentation on summary judgment only to that evidence necessary to establish the existence of triable issues of fact. Therefore, they were entitled to obtain additional discovery and present additional evidence to support additional arguments concerning their right to pierce the corporate veil. Appellants, in their pretrial conference statement, identified four additional legal theories which they sought to prove at trial and to investigate during discovery.[1] Following discussion by the parties, the Bankruptcy Court ruled that it would limit discovery and triable issues to the five issues set forth in its summary judgment and Rule 43(e) orders. Those issues included the following:

1) Whether or not during the period relevant, JWC exercised such pervasive dominant control over the affairs of Celotex which, in fact, made Celotex nothing more than a sham or an alter ego of JWC;

2) Whether or not the inter-company transactions between Celotex and JWC disregarded all hallmarks of the separateness of the legal and equitable existence of a subsidiary from its parent, that is, the operation of the cash management system, and the record-keeping activities of both entities concerning inter-company transactions;

3) JWC is liable for such personal injuries because after lodging Panacon in Celotex as a matter of corporate form, JWC permitted Celotex to operate with a capital that was disproportionately small in relation to the massive asbestos liabilities that were arising from asbestos-related activities carried out in the guise of Celotex.

4) JWC is liable for such personal injuries because, in all the facts and circumstances, any claims that JWC had on the assets of Celotex, whether in the nature of debt or equity, were equitably subordinated to the claims of asbestos victims.

---

1. These specified theories included the following:

1) JWC is liable for personal injuries inflicted by Celotex's asbestos-related activities because Celotex was the mere instrument, agent, and servant of JWC in respect of those activities.
2) JWC is liable for such personal injuries because JWC directed and controlled the acquisition of The Panacon Corporation ("Panacon") at a time when JWC and its management knew or reasonably should have known that Panacon had caused, and was continuing to cause, thousands of persons to suffer disabling and fatal disease as a result of exposure to asbestos and asbestos-containing products.

3) To what extent JWC was involved in the decision-making process concerning the sale of assets of Celotex;

4) Whether or not the disposition of assets of Celotex was based on a valid economic basis and was fully justified by the prevailing market conditions; and

5) Whether or not the utilization of the proceeds in fact was not repayment of valid obligations and resulted in rendering Celotex insolvent and without sufficient assets to respond to the claims of the Asbestos Claimants.

The Bankruptcy Court further ruled that Appellants would only be permitted to obtain discovery and present facts on the first of their additional asserted theories, that Celotex functioned as an instrument and agent of JWC, as that theory was duplicative of the aforementioned theories. The parties then engaged in discovery and the Bankruptcy Court commenced the five-day trial of the adversary action on December 13, 1993.

## C. Bankruptcy Court's Memorandum Opinion and Final Judgment

The Bankruptcy Court issued a final judgment against Appellants, along with its Findings of Fact, Conclusions of Law and Memorandum Opinion, on April 18, 1994. In its Opinion, the Bankruptcy Court noted that Appellants, although technically Defendants in the adversary case, carried the burden of proving that the corporate veil should be pierced. The Bankruptcy Court focused its discussion on those five factors relevant to the veil-piercing issue, enumerated in its pre-trial order. The Bankruptcy Court first explained in great detail the cash management system and the financing methods established by JWC for use with its subsidiaries. The Court then examined the disposition of assets undertaken by JWC from 1982 to 1987. The Bankruptcy Court further explained the developments in asbestos litigation during that time period.

In resolving the issues before it, the Bankruptcy Court applied both Florida and Delaware law, as JWC was incorporated in Delaware with headquarters in Florida, and Celotex was incorporated in Florida, with headquarters in Florida. The Bankruptcy Court enumerated those factors under the applicable law necessary to support a veil-piercing claim, including:

1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholder shareholders were in fact alter egos of the corporation;

2) the corporate form must have been used fraudulently or for an improper purpose; and

3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*See Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla.1984); *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260 (D.Del. 1989). The Bankruptcy Court stressed that under both Delaware and Florida law, Appellants were required to provide proof of deliberate shareholder misconduct in the use of the corporate form, tantamount to fraud, before the Court would pierce the corporate veil. Appellants could not simply rely on an instrumentality theory, under which the veil may be pierced solely upon a showing that the subsidiary is a mere instrumentality of its parent.

The Bankruptcy Court found that JWC and Celotex did not act improperly when Celotex disposed of approximately $151.6 million of its assets from the early 1980s to 1987. The Bankruptcy Court concluded that the assets were not sold and transferred in an attempt to render it unable to respond to asbestos claims, but were sold in response to an extreme downturn in the economy, with its deleterious effect on the real estate market and the businesses of JWC and Celotex. The Bankruptcy Court further found that JWC and Celotex acted properly in utilizing revenue from the disposition of assets to repay the intercompany payable due from Celotex to JWC. The Bankruptcy Court classified the advances creating a portion of the payable as a loan, and the remainder of the payable as debt as well. It concluded that Celotex was permitted to repay JWC, rather than hold proceeds from asset sales in reserve for potential asbestos claimants.

The Bankruptcy Court further set forth applicable law concerning the pervasive domination and control aspect of the veil-piercing test. Upon examination of certain aspects of the JWC–Celotex parent-subsidiary relationship, including the cash management system, the corporate assessment, the line of business reporting practice, and the decision-making process, the Bankruptcy Court found that these intercorporate relations were not improper, but instead consistent with sound business practices. The Bankruptcy Court also found proper and customary JWC's policy that its subsidiaries were required to obtain JWC's approval prior to making capital expenditures or acquisitions of capital assets. Having determined that Appellants failed to establish both elements of a veil-piercing claim, the Bankruptcy Court found in favor of Appellees. The Bankruptcy Court entered judgment in Appellees' favor not only on the veil-piercing count of the Amended Adversary Complaint, but on all counts of that Complaint.

#### D. Issues on Appeal

Appellants challenge several aspects of the pretrial proceedings in the Bankruptcy Court, various evidentiary rulings, the law applied by the Bankruptcy Court, and the Bankruptcy Court's application of law to the facts of the case. Appellants assert that the Bankruptcy Court made the following errors:

[T]he bankruptcy court erred by ignoring presumptions applicable to the parent's intent and by failing to shift to plaintiffs/appellees the burden of showing the good faith and entire fairness of the parent's conduct ...

[T]he bankruptcy court erred in upholding the accountant-client and attorney-client privileges to bar discovery and exclude evidence ...

[T]he bankruptcy court erred in excluding expert testimony relevant to [Celotex's] insolvency and its parent's scienter ...

[T]he bankruptcy court erred in granting partial summary judgment as to material facts in dispute and foreclosing a viable legal theory for piercing the veil.

Appellants further contend that the Bankruptcy Court erroneously entered judgment as to the three counts of the adversary complaint which had not yet been litigated. Most significantly, Appellants assert that they are entitled to judgment in their favor because they met their burden of proving those elements necessary to pierce the corporate veil. They challenge the Bankruptcy Court's interpretation of law concerning the elements of improper conduct and pervasive domination, and the Bankruptcy Court's application of law to the facts.

### II. DISCUSSION

#### A. Standard of Review

In evaluating the issues on appeal, the Court reviews the Bankruptcy Court's findings of fact under a clearly erroneous standard. *In re Sublett*, 895 F.2d 1381, 1383 (11th Cir.1990). A district court is not authorized to make independent factual findings, and must remand the case to the bankruptcy court if that court's factual findings are ambiguous as to a determinative factual question. *Id.* at 1384. This Court reviews the Bankruptcy Court's conclusions of law *de novo*. *In re Georg*, 930 F.2d 1563, 1565 (11th Cir.1991); *In re Sublett*, 895 F.2d at 1383. This Court will further review *de novo* questions involving the application of law to particular facts. *Flagship Marine Services, Inc. v. Belcher Towing Co.*, 966 F.2d 602, 604 (11th Cir.1992). In accordance with these standards, the Court will address each point of error raised by Appellants.

#### B. The Bankruptcy Court's Summary Judgment Order

Appellants assert that the Bankruptcy Court, by limiting the scope of triable issues in its August 25, 1992 summary judgment order, in effect granted summary judgment in Appellees' favor with respect to those issues and theories not listed as triable. Appellants specifically contend that they were precluded from establishing that JWC engaged in improper conduct because it knew of Panacon's contingent asbestos liabilities when causing Celotex to merge with Panacon, yet failed to provide the merged entity

with capital commensurate to the risk.[2] Appellants contend that the Bankruptcy Court further erred by making factual findings within its summary judgment order.

█ Rule 56(d), Federal Rules of Civil Procedure, applicable to the proceeding below through Rule 7056, Federal Rules of Bankruptcy Procedure, provides in pertinent part:

*Case Not Fully Adjudicated on Motion.* If on motion under this rule judgment is not rendered upon the whole case for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy ... and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Rule 56(d) imposes a compulsory duty on the court considering the summary judgment motion to specify the uncontroverted material facts. 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure,* § 2737 at 459–60 (1983). Additionally, parties present extrinsic evidence on a summary judgment motion with an awareness that certain facts can be deemed established and will be binding on them at

trial. *Scott Paper Co. v. Taslog, Inc.,* 638 F.2d 790, 796 (5th Cir.1981).

The Bankruptcy Court therefore had an obligation under Rule 56(d) to make factual findings for the purpose of limiting issues for trial, and the parties in this case engaged in discovery and presented evidence in conjunction with the rule. Accordingly, this Court finds that the Bankruptcy Court properly made factual findings in its Summary Judgment Order and listed disputed factual issues remaining for trial.[3] Furthermore, the Bankruptcy Court's findings were not clearly erroneous, and in fact were primarily historical in nature, regarding the origin of the companies involved and their organization structures.[4]

█ The Court is further not persuaded by Appellants' argument that the summary judgment order prevented them from asserting a theory that JWC directed Celotex's acquisition of Panacon with knowledge of contingent asbestos liabilities, but failed to endow Celotex with adequate capital. The Bankruptcy Court did not preclude presentation of this argument in the summary judgment order. Instead, the Bankruptcy Court eliminated this issue for trial in its February 3, 1993 Order On Pre–Trial Conference Determining The Issues To Be Tried And To Set Limits Of Additional Discovery, after hearing extensive argument by the parties concerning the preclusion of particular issues. The Bankruptcy Court noted in the pretrial order that Appellants' theory was inconsistent with arguments made by Appellants that Celotex's acquisition of and merger

2. In their appellate brief, Appellants present this theory as the only one from which they were precluded from pursuing at trial. Previously, in their pretrial conference statement of January 4, 1993, filed in the adversary proceeding, Appellants argued that the Bankruptcy Court's limitation of issues precluded them from proceeding upon two additional theories. The Bankruptcy Court considered the theory that Celotex was the mere instrument or agent of JWC in the conduct of asbestos-related activities as duplicative of the five enumerated triable issues, and Appellants were permitted to present evidence to support this argument at trial. Appellants also previously argued that the Bankruptcy Court's summary judgment order precluded them from establishing that JWC's claims were equitably subordinated to the claims of asbestos victims. Because

Appellants have not now identified this theory as one eliminated by the Bankruptcy Court, this Court will not consider whether any error could be inferred from such an elimination.

3. The Bankruptcy Court recognized at a September 8, 1992 conference that its summary judgment order at pages five through thirteen recited undisputed facts.

4. The Court further notes that the Bankruptcy Court did not make its factual findings in the summary judgment order prematurely, before submission of pertinent evidence. Appellants did not move to extend discovery prior to the Bankruptcy Court's deadline for filing summary judgment submissions, nor did Appellants move under Rule 56(f) to obtain additional discovery.

with Panacon was a mere sham and was in fact a merger into JWC. The Bankruptcy Court was unaware of any legal theory which would permit Appellants to pierce the corporate veil based on the acquisition of a business with knowledge of its contingent liabilities. Additionally, the Bankruptcy Court found no authority to support the argument that a parent has a legal duty to assure continuous adequate capitalization of its wholly-owned subsidiary, especially when the subsidiary was an existing corporation at the time it was acquired by the parent.

Pursuant to Rule 16, Federal Rules of Civil Procedure, a court may utilize a pretrial conference to formulate and simplify issues of a case for trial and to eliminate frivolous claims or defenses. *Fed.R.Civ.P.* 16(c)(1). By identifying litigable issues, a court helps to conserve judicial resources and promote efficiency. Rule 16, advisory committee's notes. The Bankruptcy Court, after hearing argument from both parties regarding the presentation of a theory of improper conduct based upon the Panacon merger, determined that the theory was inconsistent with Appellants' other claims, and unsupported by law. This Court finds that the Bankruptcy Court acted properly in excluding this argument concerning improper conduct from trial.

■ The Bankruptcy Court correctly noted that Appellants' alternative theory regarding improper conduct appeared inconsistent with other arguments made by Appellants. For example, at no time during summary judgment proceedings did Appellants raise the argument that JWC failed to endow Celotex with adequate capital following the 1972 merger with Panacon. Instead Appellants contended that JWC directly assumed Panacon's asbestos-related liabilities because, as the alter-ego of Celotex, it directly purchased Panacon. Additionally, Appellants' argument regarding the failure to adequately capitalize Celotex in 1972 appears to contradict its concurrent assertion that JWC continually made capital contributions to Celotex until 1981, when the divestiture of Celotex assets commenced.

■ The Bankruptcy Court also examined the viability of the theory in light of applicable veil-piercing law, and found no support

for Appellants' argument concerning the Panacon merger. A party seeking to pierce the veil of a corporation can rely on a parent corporation's inadequate capitalization of its subsidiary as evidence of wrongdoing. See 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 44.1 (1983 rev. ed.). However, inadequate capitalization refers to the amount of capital provided to a subsidiary upon its formation. *See In the Matter of Multiponics, Inc.,* 622 F.2d 709 (5th Cir. 1980); *Diasonics v. Ingalls,* 121 B.R. 626 (Bankr.N.D.Fla.1990) (finding in context of subordination of a claim that a company is undercapitalized if at its formation it lacks adequate capital to support the size and nature of the business). A subsidiary which incurs losses subsequent to its incorporation is not considered undercapitalized. *United States v. Fidelity Capital Corporation,* 920 F.2d 827, 839 (11th Cir.1991) (applying Georgia law, and citing W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 44.1 (1983 rev. ed.)); *see also J.R. Grain Co. v. FAC, Inc.,* 627 F.2d 129, 135 (8th Cir.1980) (holding "[a] corporation that was adequately capitalized when formed but has suffered losses is not undercapitalized"). The Bankruptcy Court noted, "[t]here is not a scintilla of evidence in this record that at its creation, Celotex was undercapitalized." *Hillsborough Holdings,* 166 B.R. at 401. Based upon a review of applicable law, this Court cannot conclude that the Bankruptcy Court erred in eliminating for trial the issue that JWC failed to capitalize Celotex following the Panacon merger, as the theory was based upon the erroneous premise that a parent is required to capitalize its subsidiary following the subsidiary's acquisition of an asset.

## C. Accountant–Client and Attorney–Client Privileges

■ Appellants argue that the Bankruptcy Court prevented them from discovering evidence of JWC's fraudulent intent by upholding an application of the accountant-client and attorney-client privileges. During discovery and throughout trial, Appellees asserted that an accountant-client privilege protected certain documentation in the possession of JWC's accountant, Price Water-

house ("PW"), and that the attorney-client privilege protected various documents and communications of James Kynes, now deceased, who served as in-house general counsel for JWC. Discovery and evidentiary matters are ordinarily committed to the lower court's discretion, and orders concerning those matters will not be overturned unless the lower court has abused its discretion, causing substantial harm to the party seeking relief. *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1413 (11th Cir. 1994), *modified on other grounds*, 30 F.3d 1347 (11th Cir.1994). However, the Court reviews *de novo* discovery rulings which involve mixed questions of law and fact regarding the applicability of the attorney-client and accountant-client privileges to particular communications. *Id.*

## 1. Privileged Nature of Price Waterhouse Documents

A brief review of the proceedings below with respect to the privilege issue places the Bankruptcy Court's ruling on the privileged nature of PW documents in context. At a March 17, 1993 hearing, the Bankruptcy Court considered the privilege attaching to various documents contained within PW's audit files.[5] At the hearing, the asbestos claimants argued that the various documents in the audit file were not protected by the accountant-client privilege because they were not prepared by PW. Specifically, the asbestos claimants asserted that copies of JWC's business records, which JWC provided to PW for use in performing audits, and various communications to PW from third parties were not privileged.

At the hearing, Appellees responded that privilege attached to all documentation within the audit files because the information was used by PW in PW's analysis of JWC's financial statements. Additionally, Appellants noted that some of the documentation within

the files contained privileged handwritten notes made by PW auditors directly on the documents, while other documents were PW workpapers prepared by PW accountants. Appellees stated that the audit file documentation was voluminous, extending over 100 linear feet.

After considering the parties' arguments, the Bankruptcy Court noted that no privilege attached to the copies of JWC documents provided by JWC to PW because they were not prepared by the accountants. However, the Bankruptcy Court noted that the audit file contained documents and analyses prepared by PW accountants. Therefore, the Bankruptcy Court found that the accountant-client privilege barred discovery of documents reflecting notation and analysis by PW accountants. At the hearing, the Bankruptcy Court further characterized Appellants' broad discovery request as a "fishing expedition." Due to the burden placed upon Appellees by the broad discovery request, the Bankruptcy Court indicated that it would not require Appellees to search through all PW audit files to produce the non-privileged documents, nor would it require Appellees to prepare a log of privileged documents for Appellants. Instead, the Bankruptcy Court stated that it would require counsel for Appellees to make a list of the documents provided by JWC to PW. Because no privilege attached to the listed documentation, Appellants could then make specific document requests of Appellants from the list. In accordance with the Bankruptcy Court's Order, JWC provided such a list to Appellants, which exceeded 20,000 pages.

Subsequently, the asbestos claimants filed a renewed motion to compel compliance with their discovery request, in which they again renewed the broad request for a significant portion of PW documentation which was the subject of the March 17, 1993 hearing. The

---

**5.** Appellants indicate that on appeal they challenge only the denied production of documents listed at pages 694–698 of the Appendix to their appellate brief. These requested documents include documents containing information regarding: the acquisition and divestiture of businesses on behalf of Celotex or its subsidiaries; plans of JWC and various subsidiaries to dispose of assets; the accounting treatment of cash transfers

between JWC and Celotex; various payments made to JWC by its divisions; various intercompany transactions or accounts; JWC's cash management system and capital expenditure controls; the materiality of asbestos claims; the extent of insurance reserves; and various listed monthly accounting statements, ledger listings, journal entries, long-range plans and other assorted documents.

Bankruptcy Court held a hearing on the Motion on July 14, 1993, and advised counsel that it would resolve the motion in accordance with the findings of the March 17, 1993 hearing. The Bankruptcy Court then entered a written order on August 12, 1993 denying Appellants' motions to compel responses to its various requests for the PW documents, and reciting the statements which it made in the March 17, 1993 and July 14, 1993 hearings. At no time did Appellants make a request for production of documents from the list provided by Appellees. Additionally, at no time did Appellants make an argument that the list provided was deficient in any manner.

■ Florida has enacted statutory law which protects communications between a public accountant and its client made in the rendition of accounting services to the client. Fla.Stat. § 473.316; Fla.Stat. § 90.5055. Various Florida courts have permitted the invocation of the privilege to prevent disclosure of audit workpapers and related documents prepared by an accountant. *See Deloitte, Haskins & Sells v. Southern Finance Holding Corp.*, 566 So.2d 906 (Fla. 4th DCA 1990) (quashing circuit court order requiring discovery of financial records and workpapers in accountant's possession); *Affiliated of Florida, Inc. v. U–Need Sundries, Inc.*, 397 So.2d 764 (Fla. 3d DCA 1981) (holding that confidential memorandum prepared by accountant concerning the viability of a contract is privileged). However, a client cannot shield non-privileged financial information from discovery by turning the information over to its accountant. *Paper Corp. of America v. Schneider*, 563 So.2d 1134 (Fla. 2d DCA 1990).

■ The parties to this appeal do not contest that the privilege was inapplicable to copies of documents provided by JWC to PW, and requested during discovery. Instead, Appellees argue that the various notations contained on those documents rendered them privileged. Appellees also assert that Appellants waived their right to obtain discovery of the non-privileged documents by failing to request specific documents from the prepared list, instead renewing their wholesale discovery request. This Court agrees that notations made by PW accountants on non-privileged documents were privileged and non-discoverable, as they reflected PW's analysis of the financial data. The Court cannot, however, conclude that the documents themselves were rendered privileged by the placement of privileged notations upon them. It is possible that PW could have produced the documents in a redacted form, thus allowing discovery of the non-privileged information without violating the applicable privileges. *See Southern Bell Telephone & Telegraph Co. v. Deason*, 632 So.2d 1377 (Fla.1994) (finding that an attorney was permitted to redact privileged notations, thoughts and impressions prior to producing non-privileged documents).

■ However, the Court also finds that given the asbestos claimants' extremely broad discovery request, and given that requested documents spanned approximately 100 linear feet of space, the Bankruptcy Court was reasonable in denying the wholesale discovery request, and instead requiring JWC to provide to asbestos claimants a list of documents which it provided to PW, from which Appellants were expected to specify the documents sought. Appellants failed to utilize this reasonable procedure, thus failed to obtain discovery of the requested non-privileged documents and documents in redacted form. Appellants cannot now assign fault to the Bankruptcy Court for failing to compel production of non-privileged materials when Appellants failed to utilize the specified procedure for obtaining these materials. Accordingly, the Court finds that the Bankruptcy Court was correct in concluding that documents in PW's audit files containing PW analysis and notation merited the protection of Florida Statutes, Sections 473.316 and 90.5055. Additionally, this Court finds that Appellants' failure to obtain non-privileged documents cannot be attributed to any error on the part of the Bankruptcy Court.

### 2. Waiver of Accountant–Client Privilege by Publication

■ Appellants assert that even if the requested documentation is privileged, the use of such information in PW's publicly-disseminated audit opinions renders the priv-

ilege inapplicable. Appellants bear the burden of establishing any waiver of the accountant-client privilege. *See Deloitte, Haskins and Sells*, 566 So.2d 906. Several cases have addressed the privileged nature of analyses underlying a publicly-disclosed statement. The court in *Carey–Canada Inc. v. California Union Ins. Co.*, 118 F.R.D. 242 (D.D.C. 1986), examined the privilege which attaches to drafts of litigation footnotes prepared by attorneys, when the final versions of the footnotes were intended to be and were published within a company's annual reports. That court found:

> The fact that the final drafts were intended to be disclosed to the public does not render the privilege inapplicable. Surely defendants would not argue that prior drafts of the pleadings it has submitted to this court and filed in the public record are not protected from disclosure by the work-product privilege.

*Id.* at 246. The Court finds such reasoning applicable with respect to production of the materials used and created by PW in preparing public audit opinions of JWC's financial statements. Although PW intended the opinions for publication, there is no evidence that PW also intended to make public its underlying analyses based on materials provided by JWC. Therefore, the Court concludes that the privilege attaching to such documents is not thereby waived. *Accord Apex Municipal Fund v. N–Group Securities*, 841 F.Supp. 1423, 1427 (S.D.Tex.1993) (holding preliminary drafts of documents and communications between an attorney and client during the drafting process are privileged, and only those parts of the documents which ultimately appear in published documents are outside the privilege).

### 3. Waiver of Accountant–Client Privilege by Disclosure to Third Parties

Appellants also argue that JWC waived the privilege attaching to documentation within the audit files based on JWC's disclosure of that information to third parties.

JWC allegedly disclosed the information to various third parties during due diligence meetings held in November of 1982 regarding prospective financing. In support of this argument, Appellants rely primarily on a memorandum ("Memorandum")[6] produced by a non-party witness, Merrill–Lynch, in which a Merrill–Lynch employee recounted the meetings. The Memorandum states that representatives from JWC, PW, Merrill–Lynch, counsel for Merrill–Lynch, and other organizations were present at the due diligence meetings. It indicates that the participants at the meeting discussed due diligence matters, including "issues relating to the asbestos-linked litigation." The Memorandum further notes that the participants learned that PW had performed both qualitative and attempted quantitative analysis regarding JWC's asbestos-related litigation, but "this analysis was not available." The Memorandum goes on to state that an analysis prepared by Ken Matlock, Chief Financial Officer of JWC and a Vice President of Celotex, and attached to the Memorandum, was essentially identical to the unavailable analysis prepared by PW. Attached to the Memorandum is an analysis called a "worst case scenario" for the year 1982. A note at the top of the document says, "Prepared by Ken Matlock." The Memorandum then states, "[t]he assumptions behind this analysis were then reviewed and discussed in some detail."

Appellants assert that this worst case scenario, attached to the Memorandum, was prepared not by Ken Matlock, but by PW. In support of the contention that PW performed the analysis, Appellants refer to another copy of a 1982 worst case scenario, identical to that attached to the Memorandum, assertedly produced from HHC's files.[7] This copy of the 1982 worst case scenario obtained from HHC does not indicate who prepared the document. Appellants lastly rely on another document, which appears to estimate the effect of Asbestos litigation on stockholders' equity, to support its argument that PW prepared the 1982 worst case scenario.[8] However, this document has a differ-

---

6. This document is Defendants'/Appellants' Exhibit 846.

7. This is Defendants'/Appellants' Exhibit 840.

8. This is Defendants'/Appellants' Exhibit 855.

ent format from the 1982 worst case scenario and does not identify its author.

Appellants, in their motion to compel production of audit files, argued that Appellees waived the privilege attaching to the audit file information by disclosing privileged information at the due diligence meetings. Appellants argued that the memorandum and attached worst case scenario established that PW prepared the worst case scenario analysis, provided the worst case scenario at the due diligence meeting, and discussed its analyses with third parties at the due diligence meetings. The Bankruptcy Court concluded in a November 5, 1993, order that the Memorandum itself made no disclosure of privileged information contained within PW's audit files, nor did the Memorandum evidence that any disclosure of communications had occurred at the due diligence meetings. The Bankruptcy Court further found that PW's participation in the meetings, in and of itself, did not result in a waiver of the privilege.

■ Upon a review of the pertinent documentation, the Court cannot conclude that the Bankruptcy Court erred in finding that the Memorandum and attached 1982 worst case scenario analysis failed to evidence a disclosure of privileged information. The authorship of the attached 1982 worst case scenario analysis is uncertain. Furthermore, because the Memorandum does not clearly state which participant in the due diligence meetings reviewed and explained the analysis, this Court cannot conclude that PW undertook such explanation. Because evidence regarding the due diligence meetings and worst case scenario documents does not establish a waiver of the accountant-client privilege, the Bankruptcy Court properly upheld the privilege. *See Affiliated of Florida, Inc. v. U–Need Sundries, Inc.,* 397 So.2d 764, 766 (Fla. 2d DCA 1981) (finding that a party did not waive an accountant-client privilege when the accountant had not disclosed confidential information).

### 4. Waiver of Accountant–Client and Attorney–Client Privileges by Issue Injection

As a final argument regarding privilege, Appellants assert that the Bankruptcy Court

should have permitted them to discover otherwise privileged information because JWC waived the accountant-client and attorney-client privileges by injecting the professional activities and advice of JWC's accountants and corporate counsel as issues in this case. Appellants indicate that Appellees have primarily injected these issues into the case in the following manner:

1. Appellees submitted an affidavit of Mr. G. Thomas Frankland, a PW partner, in support of their summary judgment motion, in which Mr. Frankland stated that JWC's intercompany account and corporate assessment "were properly treated as debt and expenses," and "are *not* equity investment or dividends," and that Celotex had no obligation under generally accepted accounting principles to accrue a loss for its contingent asbestos liabilities.

2. Various JWC officers testified that they did not evaluate the impact of asbestos litigation because Mr. Kynes, in-house counsel, told them the problem was manageable, and JWC's outside counsel testified that he relied on Mr. Kynes' representation in preparing public securities information.

3. At trial, Appellees questioned JWC director Robert Lanzilotti and JWC controller William Weldon regarding 1) who was handling the asbestos litigation, 2) whether Mr. Kynes ever told them asbestos liabilities were unmanageable, 3) whether anyone from PW ever told them that asbestos liabilities were unmanageable, and 4) whether they would have expected Mr. Kynes or PW to tell them about the unmanageability of asbestos liabilities.

During discovery and at trial Appellants attempted to elicit privileged information regarding communications which the witnesses had with PW and Mr. Kynes on the basis that Appellees waived any existing accountant-client and attorney-client privileges by affirmatively injecting into the case issues which Appellants say required discovery of otherwise privileged information.

■ A party waives the attorney-client and accountant-client privileges which attach to various communications if that party "in-

jects into the case an issue that in fairness requires an examination of otherwise protected communications." *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir.1994). The waiver of the privilege is based upon a premise that "when a party's conduct reaches a certain point of disclosure, *fairness* requires that the privilege cease." *Id., citing Goldman, Sachs & Co. v. Blondis*, 412 F.Supp. 286, 288 (N.D.Ill.1976); *see also United States v. Bilzerian*, 926 F.2d 1285 (2d Cir.1991), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991). Thus, the law regarding waiver prevents a party from placing some privileged information into evidence for his own benefit, then arguing against disclosure of the remainder of privileged information, when the failure to disclose would prove manifestly unfair to the opposing party. *Cox*, 17 F.3d at 1418 (citing *Pitney–Bowes, Inc. v. Mestre*, 86 F.R.D. 444, 447 (S.D.Fla.1980)).

■ As a general rule, a party does not waive the accountant-client and attorney-client privileges by simply bringing or defending a lawsuit. *Home Insurance Co. v. Advance Machine Co.*, 443 So.2d 165, 168 (Fla. 1st DCA 1983) (finding that plaintiff, by bringing suit for contribution and injecting the requisite element of reasonableness of settlement as an issue does not waive the attorney-client privilege); *compare GAB Business Services, Inc. v. Syndicate 627*, 809 F.2d 755 (11th Cir.1987) (holding that issue of reasonableness of settlement in indemnity cause of action is at the very heart of litigation, thus requires disclosure of attorney-client privileged information). Additionally, "a Court cannot justify finding a waiver of privileged information merely to provide the opposing party information helpful to its cross-examination or because information is relevant." *Cox*, 17 F.3d at 1418 (quoting *Remington Arms Co. v. Liberty Mutual Ins. Co.*, 142 F.R.D. 408, 415 (D.Del.1992)).

To waive a privilege, a party must do more than merely deny the opposing party's accusations, but must affirmatively raise the issue involving privileged communications. *Id.; see also Bilzerian*, 926 F.2d 1285. Nonetheless, the issue need not be raised as an affirmative defense or by the party's pleadings. For example, in *In re Barinco Corp. Securities Litigation*, 148 F.R.D. 91 (S.D.N.Y.1993), the court addressed the waiver issue in the context of a securities fraud case in which plaintiffs sought discovery of a defendant's communications with counsel. Plaintiffs in the case alleged that the defendant made a fraudulent representation in a portion of its public disclosure statement. That portion of the disclosure statement specifically indicated that the representation made therein was based upon advice of counsel. The *Barinco* court found that due to the statement's representation regarding reliance on counsel, defendant would necessarily have to offer counsel's conclusions to prove its lack of scienter in making the statement. The *Barinco* court found that unfairness would result if plaintiffs were denied access to the privileged information. Accordingly, the *Barinco* court found the privilege waived and permitted the plaintiffs to obtain information regarding defendant's communications with counsel. Likewise, the *Bilzerian* court reached a similar conclusion. The defendant in *Bilzerian* was charged with various securities law violations. The defendant filed a motion in limine, seeking to determine whether a waiver of privilege would result if he argued that he undertook various structurings of his financing arrangements in "good faith." Because the lower court found that a waiver would occur, the defendant never made his good faith argument. The *Bilzerian* court held that if the defendant had testified to his good faith, the jury would have been entitled to know the reasons why he though his actions were legal. This, in turn, would have placed privileged communications into issue and waived the privilege.

Based upon the above-enunciated legal principles, the Court will address the issues raised by Appellants concerning waiver by issue injection. As a preliminary matter, the Court notes that Appellees, by commencing the declaratory judgment action on the veil-piercing issue necessarily placed various matters at issue. For example, Appellees placed the state of mind of JWC at issue, as improper conduct is central to a veil-piercing claim. Additionally, Appellees clearly raised issues concerning the financial relationship of JWC

and Celotex, as domination and control are central to a veil-piercing claim. Nonetheless, Appellees did not place privileged communications at issue merely by bringing the declaratory judgment action. *See Home Insurance Co.,* 443 So.2d at 165.

Appellants first argue that a waiver of the accountant-client privilege occurred based on the affidavit of Mr. Frankland. The affidavit, submitted in support of Appellees' summary judgment motion, stated that the intercompany payable was debt. Mr. Frankland's affidavit was filed in response to an affidavit of Mr. Tersigni (an expert witness for Appellants), which stated that the intercompany payable was equity. At a deposition of Mr. Frankland, subsequent to the filing of his affidavit, counsel for the asbestos claimants questioned Mr. Frankland extensively regarding the sources on which he relied in preparing the affidavit. Mr. Frankland testified that he drew on his historical knowledge obtained when working on audits of JWC's consolidated financial statements and his knowledge of the cash management system. He had undertaken no review of JWC's business records and PW workpapers in preparing the affidavit. Additionally, Mr. Frankland testified that his opinion regarding the payable came from knowledge of the cash management system generally.

■ Although Appellees, by initiating the veil-piercing action, placed in issue the financial relationship between JWC and Celotex, they did not raise an issue concerning classification of the payable. Instead, Appellants initially raised the argument that the intercompany payable should be classified as equity by presenting the affidavit of Mr. Tersigni. Mr. Frankland, by presenting his opinions as an accountant regarding the categorization of the intercompany payable and the requirement of accruing a loss for contingent asbestos liabilities, did not inject these issues into the case. He merely testified to the accuracy of PW's audit opinions, which also confirmed that JWC properly represented that its intercompany payable was debt and that it need not accrue a loss for contingent asbestos liabilities. In other words, Mr. Frankland simply responded to Appellants' opinions regarding these matters set forth in

the affidavit of Mr. Tersigni. It is true that Mr. Frankland relied, in part, upon a recollection of his examination of financial statements provided to him as part of the audit process. However, nowhere within the affidavit and at no time during his deposition did he reveal the contents of analyses underlying the audit opinions. The Court cannot conclude that under these circumstances Appellees injected issues concerning privileged accounting matters into this case. Accordingly, the Bankruptcy Court did not err in finding that no waiver occurred.

■ Appellants next assert that JWC waived its attorney-client privilege because various JWC officers and directors testified that they relied on representations by JWC's legal department that asbestos liabilities were manageable. Appellees respond that Appellants raised the issue of reliance on counsel, and that Appellees strongly pursued an argument that JWC and Celotex disposed of Celotex's assets based on business judgment, in light of prevailing economic circumstances. Appellants raised this waiver issue before the Bankruptcy Court shortly before trial in a November 12, 1993 "Emergency Motion to Compel Conditional Deposition Testimony in Advance of December 13 Trial Date." In the motion, Appellants argued that various JWC and Celotex officers and directors had testified in depositions that they relied on Mr. Kynes, and not on their own judgment, to find that asbestos claims would not affect the financial condition of Celotex. Appellants, in their emergency motion, cited to various portions of the deposition testimony in which JWC's officers and directors stated that they had communications with Mr. Kynes regarding asbestos liabilities. This deposition testimony was elicited upon questioning by Appellants' counsel; Appellees engaged in no questioning of these witnesses regarding communications between the witnesses and Mr. Kynes. During the depositions, Appellees' counsel made continuous objections to questioning by Appellants' counsel which would have required the disclosure of privileged information. Appellees' counsel only permitted the various deposed witnesses to respond that they had communicated with Mr. Kynes regarding asbestos

litigation and had undertaken no independent investigation because such matters were handled by Mr. Kynes and the legal department. At no time did these witnesses disclose the content of privileged information.

The Bankruptcy Court issued an order on Appellants' emergency motion, holding that Appellees had not waived the attorney-client privilege. The Bankruptcy Court found that Appellees' defense to the veil-piercing claim—that JWC officials relied on business judgment in deciding to sell Celotex's assets—raised only an issue regarding the business judgment of JWC. At trial, Appellants elicited testimony from various JWC officers and directors that they had relied upon Mr. Kynes' representations that asbestos liabilities were manageable. Appellants also renewed the waiver argument at the trial, asserting that they should be permitted to obtain specific information regarding communications with Mr. Kynes.

The Court finds that Appellees neither waived the attorney-client privilege by bringing the declaratory judgment action, nor waived the privilege through the testimony of various JWC and Celotex officers and directors. As previously stated, although Appellees placed JWC's wrongful conduct at issue by initiating the declaratory judgment action on the veil-piercing claim, at no time did Appellees affirmatively raise an argument by motion or at trial that JWC and Celotex disposed of assets or upstreamed proceeds based upon representations of counsel or in reliance on counsel. Appellants' arguments as to improper conduct necessary to pierce the veil could have contemplated many types of wrongful activities undertaken by JWC and Celotex as parent and subsidiary. Appellants chose to pursue most strongly a theory that JWC and Celotex engaged in wrongdoing by selling assets and upstreaming proceeds with knowledge of asbestos liabilities, thereby defrauding creditors. Appellants further chose to proceed upon a premise that JWC obtained knowledge of the magnitude of those liabilities from Mr. Kynes. Evidence of communications between Mr. Kynes and management of Celotex and JWC may have been relevant or even highly probative of Appellants' theory.

However, this relevance provides no justification for ignoring the attorney-client privilege. *Cox,* 17 F.3d at 1418.

The Court further finds this case distinguishable from the *Barinco* and *Bilzerian* cases, in which waiver was held to apply to require disclosure of privileged information. In *Bilzerian,* the defendant would have waived his attorney-client privilege by *affirmatively* asserting a "good faith" argument, which was closely tied to the defendant's reliance on counsel. Appellees in this case made no such affirmative good faith argument, and Appellees' argument that they undertook asset sales due to economic conditions cannot be interpreted as a good faith argument closely intertwined with reliance on counsel. In *Barinco,* the defendant could only defend the fraud claim against him by proving non-fraudulent intent in the making of a specific public disclosure. His proof regarding intent necessarily raised privileged communications. In comparison, the instant action did not raise an issue of intent with respect to a specific transaction, as Appellants could have pursued one of a number of theories concerning wrongful conduct. Therefore, Appellees' defense of the veil-piercing claim did not necessarily put into issue a privileged matter.

Because this Court has found that Appellees have not injected privileged matters into the case solely by commencing the declaratory judgment action and defending the veil-piercing claim, the attorney-client privilege will only be waived if Appellees took affirmative steps during the course of the adversary proceedings to inject privileged matters. Such a waiver did not occur when Appellants elicited testimony from JWC officers at trial regarding their reliance on JWC's legal department to handle asbestos matters. JWC representatives provided this testimony in response to questioning regarding why they did not undertake an investigation of asbestos liabilities. In other words, these witnesses testified that they undertook no investigation because they depended upon the legal department to handle asbestos matters. However, these witnesses did not testify that they relied on representations from the legal department regarding asbestos matters in

undertaking any corporate action, including the disposition of Celotex assets and up-streaming of proceeds. The testimony of JWC representatives in response to Appellants' questioning cannot be construed as affirmative injection of an issue concerning privilege. Thus, the Bankruptcy Court correctly concluded that the testimony did not waive the privilege.

Lastly, Appellants argue that Appellees' questioning of witnesses Lanzilotti and Weldon on direct examination regarding reliance on counsel and accountants, waived the privileges. At trial, Appellants raised the waiver issue as to this testimony, and the Bankruptcy Court found that the limited testimony as to the nonexistence of the communication [9] did not result in a waiver. This Court agrees.

■ The attorney-client privilege protects the content of confidential communications between a lawyer and client. It is well established that a communication between a lawyer and client is confidential only if it is not intended to be disclosed to third persons. Fla.Stat. § 90.501; *International Telephone & Telegraph Corp. v. United Telephone Co. of Florida*, 60 F.R.D. 177 (M.D.Fla.1973); *Watkins v. State*, 516 So.2d 1043 (Fla. 1st DCA 1987), *rev. denied* 523 So.2d 579 (Fla. 1988). Although the privilege protects the client's communication with counsel, it does not necessarily protect the facts comprising the subject of the communication. *In re Grand Jury Proceedings*, 896 F.2d 1267, 1270 (11th Cir.1990); *International Telephone*, 60 F.R.D. at 186; *Brookings v. State*, 495 So.2d 135, 139 (Fla.1986). Nor does it ordinarily extend to the fact that the client has retained the attorney for certain services. *In re Grand Jury*, 896 F.2d at 186 (holding that identity of client is usually not privileged, but that a client's motive for hiring a lawyer will normally be privileged unless the client did not expect the motive to be kept confidential); *In re Colton*, 201 F.Supp. 13, 17 (S.D.N.Y.1961), *affd.* 306 F.2d 633 (2d Cir.1962), *cert. denied*, 371 U.S. 951, 83 S.Ct.

505, 9 L.Ed.2d 499 (1963) (holding that the existence or nonexistence of information regarding whether an attorney solicited from a client information regarding privileged matters is privileged).

■ There is no indication that JWC intended a privilege to attach to the mere fact that its officers and directors did or did not consult with corporate counsel on the matter of asbestos litigation. Instead, the privilege attached to the contents of the communications. *In re Grand Jury*, 896 F.2d at 1270; *International Telephone*, 60 F.R.D. at 186. Accordingly, when Appellees elicited testimony from Mr. Weldon and Mr. Lanzilotti as to whether any such consultation had occurred, they did not disclose or put into issue privileged communications. As such, they did not effect a waiver of the privileged content of those communications.

Additionally, the testimony of witnesses Lanzilotti and Weldon did not inject into the case any issues which in fairness would require disclosure of privileged information. Prior to Appellees' direct questioning of Mr. Lanzilotti and Mr. Weldon, Appellants had questioned various officers and directors of JWC and Celotex regarding who handled the asbestos litigation. The witnesses responded that Mr. Kynes handled the asbestos litigation and that Mr. Kynes provided them with information regarding the asbestos litigation. As previously noted, Appellants had also elicited testimony that the various witnesses had not undertaken independent investigations of asbestos matters, but instead relied on Mr. Kynes' representation that asbestos matters were manageable. Appellees, when questioning Mr. Lanzilotti and Mr. Weldon, asked questions similar to those asked by Appellants. Appellees elicited only information previously obtained by Appellants from other JWC and Celotex representatives. It is evident from the questioning by Appellees' counsel, that Appellees crafted their line of inquiry so as to avoid an injection of issues which would require disclosure of privileged information. Appellees' counsel did not ask

---

9. As mentioned earlier, these witnesses were asked whether Mr. Kynes and PW ever told them the asbestos liabilities were unmanageable and whether they would have expected to be so informed if such were the case. The answers were negative to the first question and affirmative to the second.

these witnesses whether they relied on representations from Mr. Kynes or from PW in undertaking the sale of Celotex assets and the subsequent upstreaming of proceeds. Nor did Appellees' counsel inquire as to the content or nature of any communication from PW or Mr. Kynes. The most that can be said is that Appellees elicited testimony that various Celotex and JWC representatives relied on counsel and therefore undertook no independent investigation of asbestos liabilities. This Court cannot conclude that the Bankruptcy Court erred in finding that this disclosure elicited by Appellees' counsel did not reach such a point that fairness would require a waiver of the privilege. *See Cox*, 17 F.3d at 1419.

## D. Exclusion of Expert Testimony

Appellants assert that the Bankruptcy Court erroneously excluded the expert testimony of Appellants' witness Robert West, a professor of accounting. Appellants indicate that Mr. West's testimony would have been relevant to issues of fraud and insolvency.[10] In October of 1993, Appellants filed in the adversary case a designation of testifying experts, which listed Mr. West as an expert. At a November 3, 1993, hearing on Appellees' motion to strike various witnesses, including Mr. West, the Bankruptcy Judge ruled that Mr. West's testimony would be excluded on the basis that Mr. West's testimony would essentially concern the accuracy of the accounting records maintained by JWC's accountant and that this testimony was irrelevant to issues involved in the case. In December of 1993, Appellants filed a motion in limine, requesting that the Bankrupt-

cy Court reconsider its rulings to exclude various proposed witnesses from testifying at trial. However, Appellants did not seek such reconsideration as to Mr. West. Appellees argue that Appellants waived their right to have the issue of the exclusion of Mr. West's testimony addressed on appeal, because they failed to preserve their objection to the exclusion of the testimony. Alternatively, Appellees contend that Appellants' assertions regarding the relevance of Mr. West's testimony have no merit.

To preserve an evidentiary issue for appeal, a party must make an objection to the matter at trial. *U.S. v. Khoury*, 901 F.2d 948, 966 (11th Cir.1990); *United States v. Rutkowski*, 814 F.2d 594 (11th Cir.1987). A party cannot rely on a court's adverse ruling on a motion in limine concerning the matter, because such a ruling will not preserve the issue for appeal. *Id.* at 598. Some courts indicate that an exception to this rule may exist when a court clearly excludes evidence on a motion in limine and it would prove inconvenient and wasteful for a party to offer the evidence at trial. *Fusco v. General Motors Corp.*, 11 F.3d 259 (1st Cir.1993) (holding that because a court's ruling on a motion in limine excluded evidence unconditionally, the evidentiary issue was preserved for appeal). However, the Eleventh Circuit has not recognized such an exception.[11] Appellants, by failing to make an offer of proof of West's testimony in either a motion in limine or at trial, did not allow the Bankruptcy Judge to fully consider the substance of the evidence offered. Appellants therefore waived their opportunity to have the issue addressed on appeal.[12]

10. Specifically, Appellants indicate that Mr. West's testimony would have been that: 1) JWC misstated its consolidated financial condition by failing to accrue a loss for pending and expected asbestos claims against Celotex, 2) Celotex was required to recognize and accrue such a loss under generally accepted accounting principles, and 3) an auditor of financial statements would have been required to qualify his audit opinion in view of problems arising from potential asbestos liabilities.

11. The Court finds the Fifth Circuit case of *Collins v. Wayne Corp.*, 621 F.2d 777 (5th Cir.1980) distinguishable from this case. In *Collins*, the contested witness's testimony was presented to

the court in a motion in limine, and that court permitted the appellant to include the contested deposition testimony in the record on appeal.

12. Even if Appellants had properly raised the issue, the Bankruptcy Court did not commit plain error in excluding West's testimony. Appellants indicated that West was prepared to testify regarding the accuracy of JWC's financial statements and of PW's audit opinions. The Bankruptcy Court did not err in finding such testimony irrelevant to the primary issues in the veil-piercing claim. Moreover, even if the Bankruptcy Court had erred in its decision to exclude the testimony, its ruling caused no prejudice to Appellants. The Bankruptcy Court did permit

### E. Legal Standards Regarding Improper Conduct [13]

■ Florida and Delaware law require that a claimant seeking to pierce the corporate veil between a parent and subsidiary corporation must establish, by a preponderance of evidence, that: 1) the subsidiary was a mere instrumentality of the parent corporation, 2) the parent corporation engaged in improper conduct, and 3) the improper use of the corporate form caused injury to the claimant. *Dania Jai–Alai Palace, Inc. v. Sykes*, 450 So.2d 1114, 1121 (Fla.1984); *USP Real Estate Investment Trust v. Discount Auto Parts*, 570 So.2d 386, 390 (Fla. 1st DCA 1990); *Symons Corp. v. Tartan–Lavers Delray Beach, Inc.*, 456 So.2d 1254, 1256 (Fla. 4th DCA 1984); *Pauley Petroleum, Inc. v. Continental Oil Co.*, 239 A.2d 629 (Del.1968); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260 (D.Del.1989).[14]

■ A shareholder engages in improper conduct if it organizes the corporation or utilizes the corporate form for an improper purpose, such as to mislead creditors or perpetrate a fraud upon them. *Dania*, 450 So.2d at 1118 (citing *Riesen v. Maryland Casualty Co.*, 153 Fla. 205, 14 So.2d 197 (1943)) ("where stockholders enter into a transaction ... [or] utilize the corporate name merely to mislead creditors or perpetrate a fraud, the legal entity will be ignored") (and citing *Riley v. Fatt*, 47 So.2d 769, 773 (Fla.1950)) ("the corporate veil will not be pierced ... unless it be shown that the corporation was organized or used to mislead creditors or to perpetrate a fraud upon them."); *see Matter of Sims*, 994 F.2d 210, 217 (5th Cir.1993), *cert. denied* — U.S. ——, 114 S.Ct. 702, 126 L.Ed.2d 669 (1994) (holding that Delaware law requires "fraud or something like it"); *Terry Apartments Associates v. Associated–East Mortgage Co.*, 373 A.2d 585 (Del.Ch.1977); *Pauley Petroleum*, 239 A.2d at 633; *Skouras v. Admiralty Enterprises Inc.*, 386 A.2d 674, 681 (Del.Ch. 1978); *USP Real Estate*, 570 So.2d at 391. *But see Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 839–40 (D.Del.1978) (piercing veil under principles of agency without reference to fraud); *In re F & C Services, Inc.*, 44 B.R. 863, 868 (Bankr. S.D.Fla.1984) (finding actual fraud need not be perpetrated upon creditors to pierce corporate veil); *Mabon, Nuget & Co. v. Texas American Energy Corp.*, 1990 WL 44267 (Del.Ch.1990) (finding that "Delaware courts have stated, although not held, that the corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent").

Appellants argue that they are entitled to establish improper conduct without showing an intent on the part of JWC to defraud or mislead creditors. They contend that the Bankruptcy Court erroneously interpreted the law regarding the improper conduct aspect of a veil-piercing claim by requiring a showing of "intentional" or "deliberate" misconduct. Instead of applying a subjective standard, which evaluates intent, Appellants argue for application of an objective test in which the Court evaluates the effects of the parent and subsidiary's actions, rather than the motivation for taking those actions. Specifically, Appellants suggest that JWC acted improperly by breaching a fiduciary duty to the creditors of Celotex, thus requiring the Court to pierce the corporate veil. Alternatively, Appellants suggest that a scienter of recklessness suffices to establish improper conduct.

■ Upon an extensive review of applicable case law, the Court concludes that to pierce a corporate veil under either Florida

---

Appellants to utilize Mr. Tersigni, an accounting expert, to give extensive testimony regarding accounting matters, including the need to accrue a loss for contingent asbestos liabilities. *See* Fed. R.Ev. 103(a); *Finch v. City of Vernon*, 877 F.2d 1497, 1504 (11th Cir.1989).

**13.** Appellants last argument concerning procedural error is that the Bankruptcy Court erred by misallocating the burden of proof concerning scienter. However, Appellants offer this argument only if the Court finds that under the applicable law, fraud is indispensable to a piercing claim. Accordingly, the Court will address this procedural matter following its discussion of the legal standards governing the piercing of the corporate veil.

**14.** Florida and Delaware have similar legal standards which govern the piercing of the corporate veil. *In re Rodriguez*, 895 F.2d 725, 728 n. 6 (11th Cir.1990).

or Delaware law, a claimant must establish that the parent corporation engaged in improper conduct by intentionally utilizing the subsidiary's corporate form to defraud creditors or engage in other wrongful activities. "[I]t is not enough to show that the corporation's 'business affairs [have] been rather poorly handled.'" *Ally v. Naim*, 581 So.2d 961 (Fla. 3d DCA 1991) (holding that shareholder of a corporation did not engage in improper conduct requiring piercing of the corporate veil by paying himself as compensation all net corporate income, leaving corporation without adequate funds to pay a personal injury judgment) (citing *Advertects, Inc. v. Sawyer Industries, Inc.*, 84 So.2d 21 (Fla.1955)). Instead, a shareholder must utilize the corporate form to engage in intentional wrongdoing. *111 Properties, Inc. v. Lassiter*, 605 So.2d 123, 125 (Fla. 4th DCA 1992) (holding that although shareholder engaged in "clever subterfuge" by forming corporation to purchase property and prevent seller from knowing his identity, such activity did not constitute "improper conduct" as contemplated by the Florida Supreme Court in *Dania* ); *USP Real Estate*, 570 So.2d at 391.

The intentional wrongdoing may take various forms. For example, a parent can engage in deliberate misconduct by making an affirmative fraudulent representation intended to mislead creditors, or by failing to reveal to creditors the nature of the parent-subsidiary relationship, with an intent to mislead. *USP Real Estate*, 570 So.2d at 393 (finding that a parent corporation engaged in improper conduct by organizing and using a subsidiary corporation for the sole purpose of signing a lease to avoid any liabilities for rent and violating the terms of the lease). However, negligent or reckless behavior does not constitute improper conduct required to pierce the corporate veil. *Ally*, 581 So.2d 961; *Steinhardt v. Banks*, 511 So.2d 336 (Fla. 4th DCA 1987) (per curiam), *rev. denied*, 518 So.2d 1273 (Fla.1987).

The Bankruptcy Court was further correct in not creating a presumption of fraud based on any breach of fiduciary duty which may have resulted from alleged preferential transfers from Celotex to JWC. Appellants argue that a parent corporation has a fiduciary duty to creditors of its subsidiary corporation, which is especially strong when the subsidiary corporation is facing insolvency. Appellants reason that if the parent corporation breaches that fiduciary duty by utilizing the corporate device to the detriment of creditors, the breach creates a presumption of fraud, even without a showing of fraudulent intent.

Contrary to Appellants' assertions, Florida and Delaware law require a claimant to affirmatively prove fraud or deliberate misconduct in conjunction with a veil-piercing claim. *Dania*, 450 So.2d at 1121; *Mobil Oil*, 718 F.Supp. 260.[15] The laws of these states create no general presumption of fraud. *Sponholtz v. Sponholtz*, 190 So.2d 572 (Fla.1966) (holding "fraud is not presumed" in the case of a fraudulent conveyance); *Reina v. Gingerale Corp.*, 472 So.2d 530 (Fla. 3d DCA 1985) (finding that "fraud is never presumed under Florida law" and that a predecessor corporation's conveyance of all assets to a successor corporation does not create a presumption of fraud, even when the successor has knowledge of pending litigation against the predecessor); *Harco National Insurance Co. v. Green Farms, Inc.*, 1989 WL 110537 (Del.Ch. Sept. 19, 1989) (finding that "under Delaware [common] law fraud is never presumed," and creditor must therefore prove that corporation made transfers to defraud them or to siphon off corporate assets, rather than repay outstanding loans to pierce corporate veil).

Additionally, Appellants misconstrue the application of preference law to the instant case. Statutory law of both Florida and Delaware provide that certain conveyances made by an insolvent entity or one that will be rendered insolvent by the transfer, with-

---

**15.** Appellants place great reliance upon the case of *In re F & C Services*, 44 B.R. 863. Although this case stated that Florida law does not require affirmative proof of fraud, the Court went on to hold that "once an actual intent to hinder, delay or defraud creditors is established by prima facie evidence, the burden of proof to demonstrate the transfer was not fraudulent rests upon the transferee." Moreover, no court has relied on the *In re F & C Services* case for the proposition that Florida does not require a showing of fraud to pierce the corporate veil.

out fair consideration, is a fraudulent transfer, irrespective of the intent of the entity making the transfer. Fla.Stat. 726.105(1)(b); 6 Del.C. § 1304.[16] However, when a transfer is deemed fraudulent under one of these statutory provisions, the statute does not also create a presumption that the transferor acted with fraudulent intent in making the transfer. Instead, state law also provides that a conveyance made with an intent to defraud, hinder, or delay is fraudulent as to both present and future creditors. Fla.Stat. 726.105(1)(a); 6 Del.C. § 1307. Several aspects of a transfer may be indicative of its fraudulent nature, including, 1) the transfer was made to an insider, 2) the transfer was concealed, 3) before the transfer was made, the debtor had been sued or threatened with suit, 4) the debtor absconded, 5) the debtor concealed assets, 6) inadequate consideration was provided for the transfer, and 7) the debtor was insolvent or became insolvent shortly after making the transfer. Fla.Stat. 726.105(2).

■ The fact that a claimant has proven intentional misconduct necessary to establish a fraudulent conveyance under state law does not necessarily indicate that the claimant has established wrongful conduct necessary to pierce a corporate veil. However, the fact that an entity has undertaken one or more fraudulent conveyances may certainly serve as evidence that the entity has engaged in deliberate misconduct necessary to support a piercing claim. *See e.g. Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841 (11th Cir.1989) (applying Florida law and stating that even if the granting of a security interest is a voidable fraudulent conveyance under New York law, "it does not mean that the corporate form is automatically disregarded"); *Harco*, 1989 WL 110537 (finding that a shareholder's transfer of assets in repayment of loans is not a basis for piercing the corporate veil, unless plaintiff also shows that the transfers were made with an intent to defraud creditors or siphon off corporate assets to avoid repayment of outstanding loans).

Appellants cite to several cases in support of their argument, in which courts have pierced the corporate veil upon a showing that an entity has made fraudulent transfers. *See Keffer v. Connors Steel Co.*, 1988 WL 152022 (S.D.W.Va.1988), *aff'd sub nom.*, *Keffer v. H.K. Porter Co.*, 872 F.2d 60 (4th Cir.1989); *Collet v. American National Stores, Inc.*, 708 S.W.2d 273 (Mo.Co.App.1986); *United Rubber, Cork, Linoleum & Plastic Workers, AFL–CIO v. Great American Industries, Inc.*, 479 F.Supp. 216 (S.D.N.Y.1979). The Court is guided by these cases only insofar as the court in each case examined preferential transfers made by corporations in those cases and determined that the conduct of the corporations was sufficiently wrongful to satisfy the applicable veil-piercing standard governing each case. *See e.g. Collet*, 708 S.W.2d at 273 (finding that parent corporation's taking of subsidiary's funds to repay intercorporate loan, leaving subsidiary an "empty hulk," was culmination of course of conduct justifying piercing of the corporate veil); *United Rubber*, 479 F.Supp. at 246 (finding that parent corporation, which engaged in a scheme to increase subsidiary's debt and then secured its loans against the subsidiary just prior terminating its operations, engaged in fraud necessary to pierce corporate veil).

Based upon the foregoing review, the Court finds that the Bankruptcy Court properly allocated the burden of proof concerning the deliberate misconduct element of the veil-piercing claim.

## F. Propriety of JWC's Conduct

Because the Court has determined that the Bankruptcy Court applied the correct legal standards to Appellants' veil-piercing claim, it is incumbent upon the Court to determine whether, in light of these standards, the Bankruptcy Court correctly concluded that JWC undertook no improper course of action which would require the piercing of the corporate veil.[17] The wrongful conduct of which Appellants complain consists of a two-step

---

16. The terms "preferential transfer" and "fraudulent conveyance" are used interchangeably.

17. The Court will subsequently address the veil-piercing element of domination and control and

Appellants' contention that the Bankruptcy Court improperly confused the issue of control with the issue of improper conduct.

process in which JWC first directed the sale of Celotex's subsidiaries, divisions, and facilities, then took proceeds from asset sales to satisfy an intercompany payable, leaving Celotex without adequate assets to satisfy claims of creditors. Appellants argue that JWC wrongfully treated the intercompany payable as debt, when the payable should have been treated as equity. Appellants further contend that even if the intercompany payable was debt, JWC acted improperly by utilizing proceeds from asset sales to satisfy its debt, taking a preference over other creditors. Appellants suggest that funds received from the various asset dispositions should have been utilized to assure that Celotex had adequate insurance or adequate capitalization to meet the liabilities associated with actual and potential asbestos claims.

### 1. Motivation to Sell Celotex Assets

The Bankruptcy Court properly found that the management of JWC and Celotex were fully aware of the increase in asbestos litigation both prior to 1982 and during the years in which Celotex sold its approximately $151.6 million in assets. Management received information concerning asbestos litigation from JWC's legal department regarding the number of pending lawsuits, costs of settlements, and prospects of litigation. This Court further finds no error in the Bankruptcy Court's conclusions regarding the impact of the recession of the early 1980s on the businesses of Celotex and JWC.

■ The Bankruptcy Court, upon consideration of the testimony and evidence, found no hard evidence supporting a conclusion that JWC directed the sale of Celotex assets for the purpose of evading potential asbestos liabilities. Instead, the Bankruptcy Court found that the record supported with greater force the proposition that JWC and its subsidiaries jointly undertook the asset sales based upon proper business judgment. This Court cannot conclude that the Bankruptcy Court erred in finding that JWC and Celotex undertook the sale of Celotex assets based upon economic conditions and that the sales were undertaken as a result of a joint effort between Celotex and JWC.

There was ample evidence presented at trial that Celotex's division managers undertook the negotiations resulting in the sale of Celotex's assets. Testimony also established that Mr. Burgen, the president of Celotex, participated directly in the sale of many of Celotex's subsidiaries, divisions, and facilities. Mr. Burgen further testified that although he was not aware of the sale of several Celotex divisions during his tenure as Celotex's president, he did, in his capacity as a Celotex Board member, sign resolutions regarding the asset sales after a review of those resolutions. Evidence was also presented at trial that economic decline motivated the sale of various Celotex subsidiaries and divisions. Many of the entities sold during the 1980s consistently lost money during the years prior to the sale. Other subsidiaries, divisions, and facilities made little or no profit during the years preceding their sale. The parties also presented testimony that JWC made intercorporate transfers of several Celotex divisions to other JWC subsidiaries based upon sound business judgment. For example, various witnesses testified that the transfers of Vestal and Windows were made to realize a tax savings.

The Bankruptcy Court, upon considering the testimony, also reached a conclusion that Appellants failed to meet their burden of proving that JWC undertook its plans concerning asset sales for the purpose of evading asbestos liability. Instead, the evidence supported a finding that sales were made to cut costs and to raise cash necessary to keep the various JWC subsidiaries "afloat." There is, therefore, record support that asset sales were undertaken in response to economic factors, and there is no clear error in the Bankruptcy Court's finding that JWC's actions were not motivated by an effort to avoid asbestos liabilities. The Bankruptcy Court was further correct in inferring no impropriety from the fact that JWC initiated the cost-cutting program to obtain cash needed to make payments to JWC's outside lenders. The fact that JWC sought to repay its lenders does not suggest that it intended to defraud the creditors of Celotex.

### 2. Utilization of Proceeds from Asset Sales

### a. Classification of the Intercompany Payable

■ It is undisputed that Celotex used the proceeds generated by asset sales for the

repayment of the intercompany payable. The relevant inquiry concerning the propriety of such a repayment concerns the proper classification of the payable as a debt or as an equity investment.[18] Appellants' argument that JWC stripped Celotex of assets by upstreaming the funds generated by the sale of Celotex's divisions and subsidiaries hinges upon a classification of the payable as equity. If the payable is debt, Appellant must rely on its alternative argument that JWC engaged in improper conduct by taking a preference over other Celotex creditors, namely asbestos claimants.

The issue of classification of an advance presents a question of law subject to *de novo* review. *In re Lane*, 742 F.2d 1311 (11th Cir.1984). The Bankruptcy Court properly enunciated the standards which govern the classification of the payable as debt or equity. A court will seek to determine the actual manner, not the form, in which the parties intended to structure the advance at issue. *Id.* at 1315. A court will examine a variety of factors in making its determination, including:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) 'thin' or inadequate capitalization;

(9) identity of interest between creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

*Id.* at 1314–15 (quoting *Estate of Mixon v. United States*, 464 F.2d 394, 402 (5th Cir. 1972)); *see also 1661 Corporation v. Tomlinson*, 247 F.Supp. 936 (M.D.Fla.1965), *affd.* 377 F.2d 291 (5th Cir.1967). A court is not required to examine all factors, and the facts of each case will help dictate those factors most relevant to a court's inquiry. *In re Lane*, 742 F.2d at 1315. Additionally, a court is not required to accept a party's characterization of an advance as a loan, but may recast the advance as a contribution to capital. *Matter of Herby's Foods, Inc.*, 2 F.3d 128 (5th Cir.1993); *Matter of Fabricators, Inc.*, 926 F.2d 1458 (5th Cir.1991) (citing *Spach v. Bryant*, 309 F.2d 886 (5th Cir. 1962)).

The advance from JWC to Celotex exhibits some, but not all formalities associated with a loan. The obligation was reflected in the 502 account and listed as a balance upon Celotex's books and on the statement of the intercompany account. JWC labeled the intercompany payable as a payable in its audited consolidated financial statements and supplementary consolidating information. JWC also reported the payable as such in its reports filed with the Securities and Exchange Commission. The labeling of the transactions as payables by the parties evidences the parties' intent to treat the advances as loans. *See United States v. Fidelity Capital Corp.*, 920 F.2d 827, 838 (11th Cir.1991) (holding that under Georgia law, entry on the corporate books of a loan is sufficient formality to characterize the obligation as a loan).

The advance was neither accompanied by a written promissory note nor by the issuance of additional stock. The lack of a promissory note, in conjunction with lack of other formalities, may indicate that advances are equity contributions. *Mixon*, 464 F.2d at 403. However, if evidence indicates that an advance otherwise complies with normal business practices and arm's length dealing, a

---

18. The intercompany payable, as previously noted, consists of both advances provided by JWC and assessments charged by JWC for services. The parties direct their arguments concerning

classification of the payable to that portion of the payable made up of advances from JWC to Celotex.

court may properly characterize the advance as a debt. Although the intercompany advance contained no definitive interest rate, JWC made interest charges to Celotex through its corporate assessment, listing the charges as "intercompany interest and corporate expense" in its audited consolidated financial statements.

JWC and Celotex further established no repayment schedule for the advance. The absence of a fixed repayment schedule may suggest that the repayment is tied to the financial success of the business and therefore point to an equity transaction. *Mixon*, 464 F.2d at 404. Although JWC did not establish a formalized repayment schedule, there was adequate evidence and testimony presented that JWC, Celotex, and third parties expected the advance to be repaid. The Bankruptcy Court characterized the obligation as "payable on demand," and this Court cannot conclude that the Bankruptcy Court erred in so finding.

The source of payments on an obligation may serve as evidence of the nature of the obligation, because a repayment dependent upon corporate earnings reflects a contribution of equity capital. *Id.* at 405. As the Eleventh Circuit indicated in *In re Lane*, an individual who seeks repayment on an advance when the corporation has "plenty of cash," exhibits a concern for the corporation's overall health, characteristic of an investor with an equity interest. *In re Lane*, 742 F.2d at 1318. The timing of Celotex's actual payments on the obligations related directly to their acquisition of funds through asset dispositions. Because Celotex utilized the funds realized from the sale of property, plants, subsidiaries and divisions to repay its payable, the repayment of the obligation was not directly tied to the profitability of Celotex.

An examination of JWC's financial relationship with its subsidiaries supports Appellees' contention that the payable was debt. JWC obtained funds from outside lenders at rates lower than its subsidiaries could have obtained individually, and made advances to its subsidiaries. JWC therefore sought repayment of the advances to obtain funds necessary to make repayment to outside lenders. Appellants point to the fact that the intercompany payable for the majority of JWC's other subsidiaries increased during the period in which Celotex's payable decreased, as evidence that the advance was equity. However, there is no indication that JWC's other subsidiaries obtained large sums of money during the cost-cutting period, which would have enabled them to make significant repayment on their obligations.

When a corporation is thinly capitalized, an advance provided to it is more likely to be characterized as a capital contribution. This is especially the case when the debt to equity ratio is initially high, when the parties recognize that the ratio may increase, and when a large portion of the funds advanced were used to meet expenses needed to commence operations. *Id.; see also Bijou–Pensacola Corp. v. United States*, 172 F.Supp. 309 (N.D.Fla.1959). The capitalization of a corporation is determined at the time of formation. *Fidelity*, 920 F.2d at 839. The Bankruptcy Court found, and this Court agrees, that there is no evidence that Celotex was undercapitalized at its creation. Celotex's adequate capitalization serves as strong evidence that the advances made to it were loans.

The use of advances by a corporation to acquire capital assets may indicate that the advances were in the nature of capital contributions. An examination of Celotex's acquisitions from the early 1970s to 1981 evidences growth in Celotex's capital acquisitions which corresponds with an increase in the intercompany payable. Likewise, the payable generally decreased as Celotex disposed of its assets and decreased its capital expenditures. This pattern of growth and decline of the payable appears to signify that Celotex utilized advances to make capital acquisitions. Although the Bankruptcy Court found that Celotex could obtain loans only at less favorable rates than the advances from JWC, it made no finding that Celotex could not have obtained loans from outside sources.

Although the intercompany payable exhibits indicae of an equity investment, the payable more closely exhibits characteristics of debt. In reaching this conclusion, the Court finds it particularly significant that Celotex

was adequately capitalized at its creation and that the parties considered advances as loans from their inception, and represented them as such to outside organizations and individuals. JWC recovered costs associated with the advance through a portion of the payable. Although a significant portion of the advances were used to acquire capital assets, there is no indication that Celotex could not have obtained funds from outside sources for similar acquisitions. Therefore, the Bankruptcy Court properly found that the advances from JWC to Celotex were bona fide loans.

### b. Improper Conduct Arising from Repayment of Debt

The Bankruptcy Court, upon finding the intercompany payable a debt obligation, reached the conclusion that JWC engaged in no improper conduct by upstreaming the proceeds from Celotex's asset sales through the cash management system to reduce the debt. The Bankruptcy Court did not address Appellants' "asset-stripping" claim because it found that the payables were not equity contributions. Likewise, this Court will address solely the issue of whether impropriety can be inferred from the alleged preferential repayment of the debt. Appellants argue that the upstreaming of assets, even in repayment of a loan, constitutes a preferential transfer evidencing wrongful behavior on the part of JWC. Appellants have conceded that the proceeds which Celotex used to pay its obligation to JWC came from Celotex's net cash flow after payments to third-party trade creditors. Additionally, Appellants have not argued that JWC took a preference to any third-party creditor except the asbestos claimants. The Court, therefore, focuses its inquiry on whether Celotex's payments to JWC constituted preferential transfers in light of Celotex's then actual and contingent liabilities to various asbestos claimants, and whether any such preferences provide adequate evidence of deliberate misconduct necessary to pierce the corporate veil.

Appellees argue that Appellants cannot establish a preferential transfer under state law because Celotex was not insolvent at the time it transferred sale proceeds to JWC. Appellees further assert that proof of a preferential transfer is not adequate to establish wrongdoing necessary for veil-piercing. Appellants respond that they do not pursue a state law preference claim which under some circumstances requires a showing of insolvency at the time of the transfers. Instead, they assert that the transfers were "preferential" insofar as Celotex, as a "troubled" corporation, was required to equitably distribute its assets. Although, in accordance with Appellants' assertion that they do not rely on state preference law, the Court will not examine Appellants' ability to establish all elements of a state law claim, the Court utilizes applicable state law as guidance in determining the preferential nature of the transfer.

As the Court previously noted, both Florida and Delaware law deem certain conveyances of an insolvent or potentially insolvent corporation fraudulent irrespective of intent, and other conveyances fraudulent based upon a showing of fraudulent intent. Fla.Stat. 726.105(1)(a), (1)(b); 6 Del.C. §§ 1304, § 1307. It is of no benefit to Appellants to rely on that fraudulent conveyance law which deems a conveyance fraudulent irrespective of intent, as Appellants are required to prove deliberate misconduct, or an intent to defraud creditors, under Florida and Delaware veil-piercing law. However, Appellants may rely on state law which deems fraudulent those transfers made with an intent to hinder, delay or defraud creditors.

The Bankruptcy Court, in concluding that JWC and Celotex acted properly in the repayment of loans, noted that Appellants were incorrect in inferring wrongful conduct necessary to pierce the veil from the fact that Celotex utilized asset sale proceeds to pay JWC, rather than to preserve funds to respond to asbestos liabilities or to purchase insurance to cover asbestos claims. In reaching this conclusion, the Bankruptcy Court relied upon the case of *In re Silicone Gel Breast Implants Products Liability Litigation*, 837 F.Supp. 1128 (N.D.Ala.1993). The court in that case held that a company is not undercapitalized merely because it is "confronted with potential tort liabilities that could exceed its assets," and that such a situation would not support a piercing of the

corporate veil. The *Silicone Gel* court further found that "there [was] no evidence that Dow and Corning drained Dow Corning of its assets, even after they had knowledge of the potential liability for silicone gel breast implants—indeed, during the years after Dow Corning's potential liability for breast implants became known, its parents in no way interfered with the continued growth in its working capital, retained assets, and total assets." *Id.* at 1138. The Bankruptcy Court was incorrect insofar as it relied solely on the *Silicone Gel* case to conclude that Celotex's upstreaming of proceeds in the face of potential or contingent liabilities was not improper as a matter of law. Although, as the *Silicone Gel* court stated, a company's potential tort liabilities may not render a company undercapitalized, the potential liability may serve as evidence of the fraudulent nature of a transfer made with knowledge of the potential liability. *See* Fla.Stat. § 726.105(2).[19]

The instant case is distinguishable from the *Silicone Gel* case, as the evidence in this case indicates that Celotex upstreamed the proceeds from asset sales to JWC after the period when Celotex's potential liability to asbestos claimants became known. The Bankruptcy Court found that the management of Celotex and JWC were fully aware of the "number of [asbestos] claims and the cost of settlements and the prospect of litigation." Nevertheless, the Bankruptcy Court properly concluded that Appellants failed to establish that JWC upstreamed proceeds with an intent to defraud creditors, as that finding is supported by the evidence. In the absence of evidence of fraudulent intent, Appellants cannot pierce the corporate veil under their preferential transfer theory.

Although Celotex had knowledge of actual asbestos lawsuits against it during those various times from 1982 to 1987 when it disposed of assets and upstreamed proceeds, there is little evidence that it knew of the magnitude of liability which it would incur as a result of that litigation or that insurance would not cover a large portion of the liability. Appellees presented evidence indicating that studies performed in the early 1980s set forth conflicting results concerning the impact of asbestos litigation on asbestos manufacturers. Additionally, Celotex made its payments on the intercompany payable in the regular course of its business by utilizing the 501 and 502 accounts, and after making payments to trade creditors. There is also no finding that JWC and Celotex attempted to conceal the transfer or that JWC concealed the moneys transferred. Moreover, it is questionable whether Celotex faced impending insolvency at the time of the upstreaming of proceeds, as it was not forced to file for bankruptcy protection until late 1990, more than two years after the allegedly fraudulent activity occurred. As the Bankruptcy Court observed, the theory of Appellants may be somewhat supported by the record; however, the evidence is inadequate to establish that JWC deliberately directed the sale of Celotex's assets and upstreamed proceeds with the requisite intent to harm creditors or engage in wrongdoing. Appellants failed to meet the burden placed upon them by Florida and Delaware law to establish improper conduct necessary to pierce the corporate veil between Celotex and JWC.

## G. Domination and Control

Because the Court has concluded that Appellants cannot establish the improper conduct element of a veil-piercing claim, it is not necessary for the Court to consider whether Appellants have proven that JWC so dominated Celotex as to render Celotex its mere alter-ego in order to find that Appellants cannot prevail on the veil-piercing count of the adversary action. Nonetheless, the Court will briefly address this element of the veil-piercing test as it is a subject of much dispute in this appeal.

Appellants assert that the Bankruptcy Court applied improper standards in assess-

---

**19.** To the extent that Celotex potentially owed damages to these asbestos claimants, these claimants can be considered "creditors" of Celotex for purposes of assessing the fraudulent nature of Celotex's transfer of sale proceeds. *Cook v. Pompano Shopper, Inc.*, 582 So.2d 37 (Fla. 4th DCA 1991) (holding a tort claimant is as protected under the Uniform Fraudulent Transfer Act as a holder of an absolute claim); *see also Schmoll v. Acands, Inc.*, 703 F.Supp. 868 (D.Or.1988), *aff'd*, 977 F.2d 499 (9th Cir.1992).

ing the control exerted by JWC over Celotex. Appellants argue that the Bankruptcy Court confused the issue of control with the issue of improper conduct by assessing the propriety of certain aspects of the business dealings between Celotex and JWC. Additionally, Appellant contends that the Bankruptcy Court erred in considering JWC's control exerted in each separate intercompany transaction instead of considering the totality of the various acts and transactions in determining the extent of control exerted by JWC. Lastly, Appellants argue that the Bankruptcy Court should have evaluated JWC's domination with respect to the specific alleged wrongful conduct in this case, the sale of Celotex's assets and upstreaming of assets.

■ A court's evaluation of domination by a parent corporation of a subsidiary is intensely fact-specific. *U.S. v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 694 (5th Cir.1986), *cert. denied*, 475 U.S. 1014, 106 S.Ct. 1194, 89 L.Ed.2d 309 (1986). Courts have typically utilized a list of factors as guidance in making this evaluation. These factors include whether:

1) the parent and the subsidiary have common stock ownership;

2) the parent and the subsidiary have common directors or officers;

3) the parent and the subsidiary have common business departments;

4) the parent and the subsidiary file consolidated financial statements and tax returns;

5) the parent finances the subsidiary;

6) the parent caused the incorporation of the subsidiary;

7) the subsidiary operates with grossly inadequate capital;

8) the parent pays the salaries and other expenses of the subsidiary;

9) the subsidiary receives no business except that given to it by the parent;

10) the parent uses the subsidiary's property as its own;

11) the daily operations of the two corporations are not kept separate; and

12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*United Steelworkers of America v. Conners Steel*, 855 F.2d 1499, 1505–06 (11th Cir.1988) (citing *Jon–T Chemicals*, 768 F.2d at 691). A court looks to the totality of these circumstances to make a factual determination whether a subsidiary is the alter ego of its parent. *Id.* An appellate court must therefore review the lower court's finding with respect to alter ego under a clearly erroneous standard of review. *Id.* (citing *Talen's Landing, Inc. v. M/V Venture*, 656 F.2d 1157, 1159–60 (5th Cir.1981)) Accordingly, this Court will review the Bankruptcy Court's findings with respect to alter ego under a clearly erroneous standard, unless the Bankruptcy Court has failed to apply the correct legal standard in reaching its conclusions.

■ The Bankruptcy Court, in evaluating the control of JWC over Celotex, focused its attention on the intercompany transactions between the companies and the role of each corporation in various decision-making processes. Upon an examination of JWC's cash management system, corporate assessment, and line-of-business reporting, the Bankruptcy Court found each mechanism proper and consistent with sound business practice between a holding company and its subsidiary. An initial reading of the Bankruptcy Court's assessment of domination exercised by JWC over Celotex with respect to certain intercorporate transactions may lead one to surmise that the Bankruptcy Court evaluated the *propriety* of these transactions, rather than the implications of the transactions on the corporate separateness of JWC and Celotex. However, upon examining the statements of the Bankruptcy Court in light of the case law upon which it relied, it becomes clear that the Bankruptcy Court engaged in a domination and control analysis, as evidenced by the various intercorporate transactions. The Bankruptcy Court relied on the cases of *Tyco Laboratories, Inc. v. DASI Industries, Inc.*, 1993 WL 356929 (N.D.Ill.1993), *United States v. Bliss*, 108 F.R.D. 127 (E.D.Mo. 1985), and *Japan Petroleum (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831 (D.Del. 1978), to conclude that JWC's use of a cash management system was consistent with business practices between a parent and subsidiary. Each of these cases found that the

existence of a cash management system, in and of itself, does not establish that a parent commingled funds with its subsidiary or otherwise dominated the subsidiary. The evidence in the instant case establishes that JWC did not commingle funds within the cash management system, but instead kept an accurate accounting of the moneys belonging to each of its subsidiaries.

The Bankruptcy Court relied on the cases of *Pulte Home Corp., Inc. v. Ply Gem Industries, Inc.*, 804 F.Supp. 1471 (M.D.Fla.1992) and *Johnson v. Warnaco, Inc.*, 426 F.Supp. 44 (S.D.Miss.1976) in concluding that JWC's corporate assessment on Celotex was not inherently improper. The courts in these cases held that a corporate assessment by a parent on its subsidiary does not evidence a commingling of funds or domination. These courts did not evaluate the assessment under the improper conduct element of a veil-piercing analysis. Evidence in the adversary action established that JWC assessed Celotex for services provided to it, including legal services, lending charges, and accounting services. The Bankruptcy Court did not err in finding that JWC's assessment of these charges upon Celotex for services did not establish domination by JWC.

The Bankruptcy Court, in evaluating JWC's line of business reporting and general oversight of Celotex, relied on cases including *In re Fairfield Plantation, Inc.*, 147 B.R. 946 (Bkrtcy.E.D.Ark.1992) and *In re School Asbestos Litigation*, 1993 WL 209719 (E.D.Pa.1993). These cases stand for the proposition that a parent does not necessarily dominate its subsidiary merely because it oversees certain aspects of its subsidiary's business and keeps centralized financial records for itself and its subsidiary. Evidence in this case established that heads of certain non-core Celotex subsidiaries and divisions reported directly to group vice-presidents within JWC, rather than to the president of Celotex. However, this reporting procedure was aligned with JWC's business and profit centers to facilitate financial reporting. Additionally, some members of JWC's board of directors also served on Celotex's board of directors. The board of JWC had close involvement in the major business planning decisions of its subsidiaries, but little involvement in the daily operations. Although JWC's line of business reporting procedures and supervision of Celotex's long-term business planning evidence JWC's control of its subsidiary, it is acceptable business practice that a parent be involved in the subsidiary's significant activities. The Bankruptcy Court concluded that JWC's involvement was not so extensive as to render Celotex the mere alter ego of JWC. This Court does not consider the Bankruptcy Court's ruling clearly erroneous, as Celotex's management ran the corporation's daily business and made significant business decisions without seeking JWC's approval.

Lastly, the cases upon which the Bankruptcy Court relied in addressing the decision-making processes of JWC and Celotex, such as *Quarles v. Fuqua Industries, Inc.*, 504 F.2d 1358 (10th Cir.1974) and *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145 (3d Cir.1988), each addressed the role of a parent's decision-making authority in assessing the parent's control over its subsidiary. These courts found that the exercise of control regarding certain expenditures does not alone dictate a finding of domination necessary to pierce the corporate veil. *See Craig*, 843 F.2d 145 (finding that involvement in capital expenditures does not establish the day-to-day involvement or constant involvement required to establish domination). Upon an examination of JWC's role in approving certain capital expenditures, acquisitions, and asset sales of Celotex, the Bankruptcy Court concluded that the involvement was consistent with accepted business standards. This was not clearly erroneous. Although JWC's corporate policy required Celotex to obtain JWC's corporate approval for all capital expenditures, there is no evidence that the policy was intended to have literal application so as to require Celotex to obtain approval for the most minute of expenditures. In contrast, Celotex was permitted to write checks daily from its zero-balance account in significant sums to purchase various items and pay expenses for the business. JWC had no day-to-day involvement in supervising the expenditures made from this account.

█ The Court agrees with Appellants' assertion that, in addition to examining the issue of control generally, a court must evaluate domination in relation to the transaction

attacked. *United Steelworkers,* 855 F.2d at 1506–07. The *United Steelworkers* case stated the relevant inquiry with respect to domination as, "not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practices in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Id.* at 1507. The Bankruptcy Court found that Celotex played a part in the decision to dispose of assets. In the context of discussing the utilization of proceeds of liquidation, the Bankruptcy Court noted that, "[a]lthough there is no question that there was a certain amount of control exercised by JWC over the affairs of Celotex and the other subsidiaries, it was exercised within the context of the holding company's relationship with its wholly owned subsidiary. This court is satisfied that this control was within normal and accepted ranges." *Hillsborough Holdings,* 166 B.R. at 475. The Court cannot conclude that the Bankruptcy Court erred in finding that Appellants failed to establish domination and control with respect to the sale of assets and upstreaming of proceeds.

■ Although the Bankruptcy Court properly examined the corporate separateness of JWC and Celotex both generally and with respect to the transaction attacked, the Bankruptcy Court failed to examine JWC's control of Celotex under a totality of circumstances. The Bankruptcy Court found that although JWC exercised a measure of control in some individual aspects of its intercorporate relationship with Celotex, that control was not so excessive as to render Celotex its alter ego. Nevertheless, the Bankruptcy Court failed to consider the cumulative effect which each aspect of control had in determining the overall domination and control exercised by JWC. The Bankruptcy Court, therefore, utilized an incorrect legal analysis to evaluate this element of the veil-piercing claim. Such an error would ordinarily require a remand of the case to require the lower court to make a determination regarding dominance and control under a correct legal standard. However, because Appellants have failed to establish the improper conduct element of their veil-piercing claim, no such remand is necessary.

## H. Entry of Judgment on All Counts of Amended Adversary Complaint

Appellants assert that the Bankruptcy Court erred by entering judgment on all counts of the Amended Adversary Complaint. Appellants contend that they should have the opportunity to go forward on Counts II through IV of the Amended Adversary Complaint because they did not concede that a ruling in the veil-piercing count would be determinative of all counts. Appellants' initial and reply briefs present very little argument concerning Appellants' entitlement to proceed on the remaining counts. Because of the relative dearth of briefing on this issue, the Court, at oral argument, invited Appellants to elaborate on their position regarding this issue. In response, counsel explained that Appellants sought to establish JWC's liability under a direct tort theory. Specifically, Appellants would seek to prove that JWC breached its fiduciary duty to the creditors of Celotex, given the financial condition of Celotex. Although there was little explanation of this breach of fiduciary duty argument, it appears that Appellants wanted to show that JWC breached its fiduciary duty by upstreaming the proceeds from Celotex asset sales, assertedly taking a preference to other creditors.

The Court finds Appellants' desire to present the breach of fiduciary duty claim to be inconsistent with the purposes of the litigation. The parties indicated on various occasions that the primary purpose of this litigation was to determine whether asbestos claimants could assert claims against HHC, now Walter Industries, for asbestos-related liabilities.[20] This purpose is also reflected in the allegations of the Amended Adversary Complaint, which seeks a declaration of the liability of HHC and Walter Industries *only* as to asbestos-related liabilities. Even if Appellants were able to establish that JWC committed a breach of fiduciary duty in the upstreaming of assets, such proof, aside from its relevance to a veil-piercing claim, would

---

**20.** The asbestos claimants also indicated on one occasion that the adversary action was also designed to determine liability on the part of non-debtors KKR and Drexel, who were involved in the LBO.

only establish JWC's liability in tort for the breach. Therefore, Appellants' ability to prove a direct tort claim would not help to determine HHC's obligation to the asbestos claimants for the asbestos-related damages. As such, the Court cannot conclude that Appellants' alleged inability to present direct tort claims in the adversary proceeding entitles them to go forward on the remaining counts of the Amended Adversary Complaint.[21]

## III. CONCLUSION

For the foregoing reasons, the judgment of the Bankruptcy Court is AFFIRMED.

**DONE AND ORDERED.**

---

21. On a few occasions in hearings before the Bankruptcy Judge, Appellants also suggested that JWC may have committed a direct tort against asbestos claimants based on its "direct involvement in asbestos activities," including its direct acquisition of Panacon. However, because Celotex acquired Panacon, it appears that the argument concerning JWC's direct acquisition was dependent upon a piercing of the corporate veil between JWC and Celotex. In these proceedings, Appellants chose not to argue that JWC engaged in improper conduct and dominated Celotex with respect to the Panacon acquisition. Accordingly, the Court finds no merit to Appellants' argument that they should be permitted to pursue the remaining counts of the adversary complaint based upon their inability to present this direct tort theory.